IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| FABIOLA ROUGH,<br><br>                    Plaintiff,<br><br>vs.<br><br>GLAXOSMITHKLINE LLC,<br><br>                    Defendant. | CV 21-56-M-KLD<br><br><br>ORDER |

This matter comes before the Court on Defendant GlaxoSmithKline LLC's ("GSK") motion for summary judgment on Plaintiff Fabiola Rough's claims for failure to accommodate and discriminatory termination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. (Doc. 21). For the reasons discussed below, GSK's motion is granted and this case is dismissed.

## I.    <u>Background</u>

GSK is a wholly owned subsidiary of GlaxoSmithKline plc, a global company that researches, develops, markets, and produces pharmaceuticals, vaccines, and consumer healthcare products. (Doc. 31, at 1 ¶ 1). GSK operates approximately twenty different sites in the United States, including a vaccine

manufacturing plant located in Hamilton, Montana ("the Site"). (Doc. 31, at 2 ¶ 3). The Site has several departments, including manufacturing, quality control, quality assurance, technical services, engineering and calibration, and employee health and wellness. (Doc. 31, at 4 ¶ 6; 5 ¶ 11; 32 ¶ 77). The Site's manufacturing department is made up of four separate groups: fermentation, production support, purification, and formulation. (Doc. 31, at 3-4 ¶ 5).

In May 2013, Rough was hired by GSK as a Value Stream Manufacturing Technician II on the manufacturing department's purification team, reporting to Travis Post. (Doc. 31, at 5 ¶ 9). Rough worked in that role until she resigned on October 1, 2019. (Doc. 31, at 5 ¶ 10).

When GSK hired Rough in 2013, the manufacturing department operated out of Building 5 ("old facility"). The manufacturing department's production needs and capabilities at the time required two separate shifts, and it was possible that employees on separate shifts would not interact with one another. (Doc. 31, at 6 ¶ 14). Shortly after she began working for GSK, Rough was diagnosed with anxiety and depression. (Doc. 31, at 34-35 ¶ 81). As a result, Rough requested, and was granted, short-term disability leave by GSK in September 2013. (Doc. 31, at 34-35 ¶ 81). Rough returned to work in January 2014, and resumed her employment without incident. (Doc. 31, at 11 ¶ 27 n. 3).

For the year ending December 31, 2015, Rough received a "partial performance" performance review. Under the rating system used by GSK at that time, a "partial performance" rating meant that the employee's performance fell below acceptable standards and that the employee was not meeting performance standards. (Doc. 31, at 7 ¶ 15).

In January 2016, one of Rough's coworkers on the purification team, Audrey Needles, reported an incident that she had with Rough at the end of 2015 to Post, who was their mutual supervisor at the time. (Doc. 31, at 7 ¶ 17). As described in Rough's discovery responses, she and Needles had a "communication misunderstanding" in December 2015, during which "Needles was aggressive towards [Rough] by yelling and throwing a stopper at a table near [Rough] and a glass container full of flammable and hazardous chemicals which included Chloroform and Methanol."[1] (Doc. 24-6, at 21).

Post discussed the incident with Needles and Rough, and then engaged the local human resources representative, Darrin Heitmann. (Doc. 31, at 8 ¶ 18). Heitmann met with Needles, Rough, and Post to discuss the incident and how Rough and Needles could work better together. (Doc. 31, at 8 ¶ 18). According to

---

[1] Rough has provided a similar description of the incident in a supporting declaration. (See Doc. 30-1, at 5-6 ¶ 10).

Rough, Needles acted aggressively during the meeting, yelling and arguing with Heitmann and Post, and not allowing Rough to speak. (Doc. 31, at 35 ¶ 83). Needles admitted that she had thrown the stopper in the direction of the glass container, but did not acknowledge that she was wrong for doing so and stated she was not going to change. (Doc. 31, at 35-36 ¶ 83). Rough claims that Needles' conduct caused her significant anxiety, stress, and depression. (Doc. 30-1, at 6 ¶ 12).

No disciplinary action was taken against either Rough or Needles as a result of the 2015 incident. (Doc. 31, at 8 ¶ 20). According to Rough, however, Post told her at her review meeting that the December 2015 incident with Needles was the reason for her "partial performance" review rating for 2015. (Doc. 31, at 7 ¶ 16). Following their meeting with Heitmann and Post, Rough and Needles were assigned to separate shifts in the manufacturing department, thus limiting their contact with one another. (Doc. 31, at 8 ¶ 19). Rough and Needles did not work together for the remainder of 2016. (Doc. 31, at 36 ¶ 84).

In late 2016, the manufacturing department transferred its operation from the old facility to a higher capacity production facility in Building 12 ("new facility"). (Doc. 31, at 9 ¶ 22). Because the Site's production needs were diminished at the new facility, the manufacturing department dropped down to one shift. (Doc. 31, at

9-10 ¶ 24). This meant that Rough and Needles would again be training and working on the same shift, which concerned Rough. (Doc. 31, at 10 ¶ 25). In 2017, Rough's supervisor at the new facility, Brad Lawson, put Rough and Needles in separate training groups to minimize their contact. (Doc. 31, at 10 ¶ 25; 36 ¶ 85). Rough and Needles had no significant contact during 2017, and Rough was given a "3-Strong Performance" rating on her year-end performance review. (Doc. 31, at 36 ¶ 86-87).

In the spring of 2018, Rough and Needles both attended a required training session at the new facility. (Doc. 31, at 10 ¶ 26; 37 ¶ 87). As Rough explains it, Needles approached her during the session and loudly attempted to instruct her, despite the fact that this was not Needles' role. (Doc. 31, at 11 ¶ 26). Shortly after this incident, Rough went out on short-term disability leave related to complications from a surgical procedure. (Doc. 31, at 11 ¶ 27). Although Rough's physician released her to resume working without restrictions as of May 29, 2018, Rough did not return to work as scheduled. (Doc. 31, at 12 ¶ 28).

On June 13, 2018, GSK sent Rough a letter stating that it had not been successful in its attempts to reach her by telephone and email,[2] and informing

---

[2] Rough raises a hearsay objection to this aspect of GSK's letter. (Doc. 31, at 12 ¶ 29). Even assuming, without deciding, that Rough's objection is well-taken, it is immaterial and does not affect the Court's analysis.

Rough that if she did not report to work or contact GSK by June 18, 2018, her employment would be terminated. (Doc. 31, at 12 ¶ 30; Doc. 24-6, at 30). The letter further advised Rough to contact GSK's human resources support center for assistance if her absences were due to a medical condition or other leave-qualify reason, or if she needed to request an accommodation. (Doc. 31, at 12 ¶ 30; Doc. 24-6, at 30).

Later that day, Rough submitted a new short-term disability request online. day. (Doc. 31, at 12 ¶ 30; Doc. 24-6, at 31). On June 15, 2018, GSK received a certification from Rough's health care provider, Kevin Brown, indicating that Rough would not be able to work for a period of one to two months due to major depressive disorder, which he indicated had begun on May 30, 2018. (Doc. 31, at 13 ¶ 31; Doc. 24-6, at 33). Brown indicated that "Rough has feared for her safety related to a coworker's actions and expressed hostility. This will need remedied." (Doc. 24-6, at 34). GSK approved Rough's request for short-term disability leave. (Doc. 31, at 13 ¶ 32).

On August 18, 2018, GSK received a certification from a different health care provider, Amanda Springer, who similarly indicated that Rough would not be able to work for a period of one to two months due to depression and wrote that "[e]mployee also has significant fear of coworker with whom she was in an

incident some time ago. She experiences significant distress when reflecting on this person and the event which impacts her ability to work." (Doc. 31, at 13 ¶ 33; Doc. 24-6, at 35-36). Springer stated that "[i]f the issue with the co-worker can be addressed so there is very little to no contact/interaction, she may be able to feel safe at work." (Doc. 31, at 13 ¶ 33; Doc. 24-6, at 36).

In an email exchange a few days later, Rough asked Heitmann about being placed in a "different position outside production" upon her return to work (Doc. 30-3, at 4). She explained that there were "many circumstances" that prevented her "from feeling safe" in her current position. (Doc. 31, at 15 ¶ 37; Doc. 30-3, at 4). Heitmann advised Rough to connect with GSK Employee Relations Manager Megan Shank, who responded to Rough on August 30, 2018 stating that she was available to schedule a time to speak with Rough "so that we may support you in facilitating your return to work." (Doc. 30-3, at 4-5).

Also on August 30, 2018, GSK sent Rough a letter advising her that her short-term disability benefits would be exhausted on November 19, 2018, and explaining various options if she was not able to return to active work status prior to that date. (Doc. 31, at 14 ¶ 34; Doc. 24-6, at 37-38). Approximately one month later, on September 25, 2018, GSK Medical and Family Leave Specialist William Frystak faxed a letter to Springer stating that "[w]e're trying to get in contact with

[Rough] to discuss her concerns and to consider supporting her return to work with an accommodation, but are unable to reach her."[3] (Doc. 31, at 14 ¶ 35; Doc. 24-6, at 39). Frystak also asked whether Rough would be able to return to work with or without accommodations when her short-term disability expired on November 19, 2018. (Doc. 31, at 14 ¶ 35; Doc. 24-6, at 39).

On October 9, 2018, GSK received a second certification from Springer, releasing Rough to return to work with temporary restrictions when her short-term disability expired on November 19, 2018. (Doc. 31, at 15 ¶ 36; Doc. 24-6, at 41-42). Springer stated that Rough's depression-related symptoms would "likely increase if she is to work with or near [Needles]," and advised that she "avoid contact" with Needles. (Doc. 31, at 38 ¶ 90c; Doc. 24-6, at 41-42). Springer also recommended that Rough start with partial days and receive training updates. (Doc. 31, at 15 ¶ 36; Doc. 24-6, at 42).

On October 31, 2018, Heitmann requested a copy of Rough's resume so that he could "look for any matches to open positions we may have." (Doc. 31, at 15 ¶ 37; Doc. 30-3, at 6). Rough promptly responded, and provided Heitmann with her resume later that day. (Doc. 31, at 15 ¶ 37; Doc. 30-3, at 6).

---

[3] Rough raises a hearsay objection to this aspect of Frystak's letter. (Doc. 31, at 14 ¶ 35). Even assuming, without deciding, that Rough's objection is well-taken, it is immaterial and does not affect the Court's analysis.

In a letter dated November 16, 2018, Shank confirmed that GSK would accommodate Rough's request to work part-time for a period of 30 days, and stated that GSK would work with Rough during that period "to understand how best to support [her] additional request for a different comparable position." (Doc. 31, at 16 ¶ 39; Doc. 24-6, at 56). Two days later, GSK received a third certification from Springer again requesting the following temporary restrictions: "Would suggest partial days to reacclimate to work environment and role. May require retraining. Suggest work away from co-worker involved in incident earlier in the year." (Doc. 31, at 16-17 ¶ 40; Doc. 24-6, at 58).

In early November 2018, Heitmann asked Lawson for assistance in evaluating Rough for various open positions at the Site. (Doc. 24-3, at 4 ¶ 11). According to Lawson, Rough was either not qualified for the open positions or, if she did meet the qualifications for a comparable open position, the position still would have required her to interact with Needles to some degree. (Doc. 24-3, at 4 ¶ 12).

Rough returned to work on November 19, 2018. (Doc. 31, at 17 ¶ 41). Rough worked on a part-time basis for approximately one month and received training. (Doc. 31, at 17 ¶ 41). To minimize Rough's contact with Needles, GSK assigned her some non-production tasks and moved her workstation to a location

away from Needles' workstation. (Doc. 31, at 17 ¶ 41). Rough also met with Heitmann to discuss her request for reassignment to a different position, and claims he told her she would likely be reassigned a quality control position. (Doc. 30-1, at 8-9 ¶ 19).

At around this time, Rough applied for several open positions with GSK, both at the Site and at other GSK locations. (Doc. 31, at 19 ¶ 44 & 40 at ¶ 94). In an undated letter corresponding roughly to Rough's return to work, Lawson and Heitmann referred to Rough's "partial performance" rating for 2015 and 2016 when addressing Rough's "lack of success in application for other positions within GSK Hamilton" for which she met the minimum qualifications. (Doc. 30-3, at 8).

In April 2019, before Rough returned to her regular production duties, Needles and Rough attended a group training session. (Doc. 31, at 20 ¶ 46). Rough claims that during the meeting, Needles "was staring at me across the room, this made me extremely uncomfortable and unable to focus in a way that I do not recall the information provided in the training. After that, I went into disability again." (Doc. 31, at 20 ¶ 46; Doc. 24-6, at 65). On or about May 2, 2019, Heitmann and Lawson met with Rough and explained to her that she had been evaluated for available positions, but there were no available comparable positions for which she was qualified. (Doc. 31, at 20 ¶ 47; Doc 24-3, at 5 ¶ 16).

Several days later, on May 13, 2019, Rough emailed Lawson that she was leaving work early and would return later that afternoon. (Doc. 31, at 22 ¶ 49; Doc. 24-6, at 75). Rough did not return, however, and instead went out on short-term disability leave again starting May 14, 2019. (Doc. 31, at 22 ¶ 49-50; Doc. 24-4, at 4 ¶ 9). On June 6, 2019, GSK received a certification from yet another health care provider, Melissa Zielinski, stating that working with Needles was causing Rough "anxiety and depression" and that Rough would be able to return to work only if she did not have to work in the same department as Needles. (Doc. 31, at 22 ¶ 51; Doc. 24-6, at 77-78).

In mid-June 2019, Frystak scheduled two calls with Heitman and Rough for the purpose of discussing her accommodation request, but Rough failed to join either call.[4] (Doc. 31, at 23 ¶ 52; Doc. 24-4, at 4 ¶ 10). Zeilinski provided GSK with a second certification on July 5, 2019, stating that Rough should remain on leave "until given a position in another area away from coworker who assaulted her" and restricted her from working in the "same area as the woman who assaulted her." (Doc. 24-6, at 91-92).

On July 10, 2019, Shank informed Rough that GSK had received her request

---

[4] Rough raises a hearsay objection to this aspect of Frystak's declaration. (Doc. 31, at 23 at ¶ 52). Even assuming, without deciding, that Rough's objection is well-taken, it is immaterial and does not affect the Court's analysis.

for an accommodation to work in a different department, and had considered alternative roles in other departments, such as quality control and technical support. (Doc. 24-6, at 79). However, Shank advised Rough that there were no open roles that met her qualifications and/or experience, and also noted that Rough had not participated in either of the scheduled calls to further discus her request. (Doc. 24-6, at 79). Shank cautioned Rough: "Although you have provided documentation supporting the Short-Term Disability (STD) benefit, you have not actively engaged in an interactive process with us regarding your return to work. It is important that you speak with us to discuss options regarding your return to work." (Doc. 24-6, at 79).

Frystak's case progress notes reflect that he left Rough a voicemail on July 12, 2019 stating that he would like to speak with her to discuss other options that would support her transition back to work. (Doc. 24-6, at 45). Frystak's notes further reflect that on July 18, 2019, Rough advised that she "declines to participate in conference call with HR to discuss return to work options." (Doc. 24-6, at 45). On July 30, 2019, Frystak emailed Rough explaining that:

> [a] phone call is necessary to enable you to bring your own ideas forward regarding what returning to work might look like. It is essential to have a verbal two-way dialogue to determine what reasonable accommodation could be provided to assist you in returning to work. Communicating via email is difficult and fails to capture the essence of the interactive process.

(Doc. 24-6, at 81).

Shank and Rough spoke by phone in late July 2019, and Shank followed up with her by email on August 12, 2019. (Doc. 24-6, at 66). Shank explained that the "[S]ite has made every effort to identify a different role for you," and it was GSK's "expectation that [Rough] actively participate in this interactive process by reaching out to schedule a call to discuss other options" and again requested that Rough provide her availability for such a call. (Doc. 24-6, at 67).

On August 21, 2019, Frystak sent a fax to Zielinski, seeking her "assistance to ensure that reasonable accommodation options can be explored." (Doc. 31, at 29 ¶ 63; Doc. 24-6, at 103). The next day, Zeilinski submitted a third certification stating that Rough would not be able to return to work "until client is able to work without contact to the woman who was abusive towards her." (Doc. 24-6, at 100). And in response to Frytak's fax, she indicated that Rough would only be "able to work if not around person who physically assaulted her." (Doc. 24-6, at 103).

Also on August 21, 2019, Rough received an offer of employment from Juno Therapeutics as a manufacturing associate. (Doc. 31, at 29-30 ¶ 64). Rough accepted the position and started work at Juno in Bothell, Washington on September 23, 2019. (Doc. 31, at 30 ¶ 30 ¶ 64). Rough did not tell anyone at GSK involved in the accommodation process that she had accepted a position with Juno

or that she had moved to Bothell, Washington. (Doc. 31,at 30 ¶ 65).

On September 17, 2019, after she had accepted her new job, Rough responded to Shank's August 12, 2019 email, writing that "I have been thinking of other ideas that do not include me changing position and that is if the person who attacked me [Needles] is removed from the area so I do not have to work with her." (Doc. 31, at 31 ¶ 67). Rough resigned from her position with GSK on October 1, 2019, one week after she began her working at Juno. (Doc. 31, at 32 ¶ 72). Rough continued to receive short-term disability benefits from GSK until her resignation on October 1, 2019. (Doc. 31, at 31  ¶ 68).

Rough filed a charge with the Equal Employment Opportunity Commission, which issued a Dismissal and Notice of Rights on February 5, 2021. (Doc. 31 at 32 ¶ 73). Rough commenced this action against GSK in May 2021, alleging claims for failure to accommodate and discriminatory termination in violation of the ADA. (Docs. 1 & 17). Because Rough resigned, her discriminatory termination claim is based on a theory of constructive discharge. GSK moves for summary judgment on all claims.

## II.  **Summary Judgment Standards**

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." The party seeking

summary judgment bears the initial burden of informing the Court of the basis for

its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of any genuine issue of material fact. *Celotex*

*Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden

where the documentary evidence produced by the parties permits only one

conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly

supported motion, summary judgment is appropriate unless the non-moving party

designates by affidavits, depositions, answers to interrogatories or admissions on

file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477

U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may

not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S.

at 248.

In considering a motion for summary judgment, the court "may not make

credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing*

*Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must

view the evidence in the light most favorable to the non-moving party and draw all

justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

## III.  <u>Discussion</u>

"The ADA prohibits an employer from discriminating 'against a qualified individual with a disability because of the disability.'" *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999) (quoting 42 U.S.C. § 12112(a)). To establish a prima facie case of discrimination under the ADA for wrongful termination or failure to accommodate, a plaintiff must demonstrate that "(1) [she] is disabled within the meaning of the ADA; (2) [she] is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [she] suffered an adverse employment action because of [her] disability." *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003). Under the *McDonnell Douglas* burden shifting approach, once the plaintiff presents a prima facie case of discrimination, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer does so, the burden shifts back to the plaintiff to do demonstrate "that the reason advanced by the employer constitutes mere pretext for unlawful discrimination." *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## A. Failure to Accommodate

For purposes of this motion, GSK assumes that Rough was "a qualified individual with a disability" within the meaning of the ADA due to her anxiety and depression. (Doc. 22, at 22 n. 9). Instead, GSK argues it is entitled to summary judgment on Rough's failure to accommodate claim because (1) the undisputed evidence demonstrates that Rough refused to participate in the interactive process required by the ADA; and (2) Rough's requested accommodation, that she be placed in a position having no contact with Needles, was unreasonable as a matter of law. Because it is dispositive, the Court addresses GSK's reasonable accommodation argument first.

To make out a prima facie case for failure to accommodate, the plaintiff has the burden of demonstrating that she is "able to perform the essential functions of the job with reasonable accommodation." *Allen v. Pacific Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003). To meet this initial burden and defeat an employer's motion for summary judgment, the plaintiff "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). Alternatively, even if an accommodation is not reasonable on its face, "the plaintiff may instead 'show that special circumstances warrant a finding that … the requested 'accommodation ' is

'reasonable' on the particular facts." *Hamilton v. GlaxoSmithKline, LLC*, 414 F.Supp.3d 1286, 1294 (D. Mont. 2019), *aff'd* 835 Fed. Appx. 936 (2021) (quoting *Barnett*, 535 U.S. at 401). "If the 'plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Hamilton*, 414 F.Supp.3d at 1295 (quoting *Barnett*, 535 U.S. at 402).

GSK argues that Rough's accommodation request for a position with "no contact" with Needles was unreasonable both on its face and under the particular factual circumstances. (Doc. 22, at 26-28). In response, Rough disputes GSK's characterization of her accommodation request, and contends she did not request a position having no contact with Needles, but rather one in a different department that would simply limit or minimize her contact with Needles. (Doc. 29, at 18). Noting that "reassignment to a vacant position" may qualify as a reasonable accommodation under the ADA, 42 U.S.C. § 12111(9)(b), Rough maintains that her request for reassignment to vacant position that would minimize her contact with Needle was reasonable on its face. Rough further argues that GSK has not shown that reassigning her to such a position would have presented an undue hardship.

To the extent Rough argues as a threshold matter that GSK has

mischaracterized her requested accommodation, the Court is not persuaded. In opposition to GSK's motion for summary judgment, Rough has submitted a declaration stating:

> My request for an accommodation to GSK has never been to have no contact with Ms. Needles. Instead, I requested to be reassigned to a vacant position so that I would not be required to work, side-by-side, in the same department as Ms. Needles and so that I would not be required to constantly interact with Ms. Needles.

(Doc. 30-1, at 8 ¶ 17). As GSK points out in reply, however, Rough's declaration is contradicted by her prior deposition testimony. At her deposition, the following exchange occurred between Rough and GSK's counsel:

> Q:    Would you agree that your request was to have no interaction – and I'm assuming the co-worker again is Ms. Needles. Is that a fair characterization of what your request was, Fabiola?
>
> A:    Yes.

(Doc. 30-2, at 212:16-20). Citing this contradiction, GSK asks the Court to apply the sham affidavit rule, which provides "that a party cannot create an issue of fact by an affidavit contradicting [her] prior testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012).

As the Ninth Circuit has cautioned, however, "the sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary

judgment." *Yeager*, 693 F.3d at 1080 (internal quotes and citation omitted). "In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Yeager*, 693 F.3d at 1080 (internal quotes and citation omitted). Even without applying the sham affidavit rule, the Court concludes that Rough's declaration is not sufficient to raise a genuine issue of material fact on the issue of whether she requested an accommodation of no contact with Needles.

GSK has provided uncontroverted documentary evidence demonstrating that the point of Rough's multiple accommodation requests was for her to have little to no contact with Needles, and that Zeilinski expressly requested a "no contact" accommodation on Rough's behalf in August 2019. Rough went out on short term disability leave in May 2018, and in June 2018 GSK received the first of several certifications from Rough's various health care providers. The first certification, from Kevin Brown, advised GSK that "Rough has feared for her safety related to [Needles] actions and expressed hostility," and stated that the situation would "need [to be] remedied" before Rough could return to work. (Doc. 24-6, at 34). Two months later, in August 2018, another health care provider, Amanda Springer,

requested accommodation on Rough's behalf in the form of "very little to no contact/interaction" with Needles. (Doc. 24-6, at 36). In an October 2018 certification, Springer advised GSK that Rough would need to "avoid contact" with Needles upon returning to work. (Doc. 24-6, at 42). A few weeks later, in November 2018, Springer completed a third certification stating that Rough should "work away from" Needles. (Doc 24-6, at 58). When Rough returned to work in November 2018, GSK assigned her some non-production tasks and moved her workstation to a location away from Needles to minimize Rough's contact with Needles. (Doc. 31, at 17 ¶ 41). Rough went out on short term disability leave again in May 2019, and on June 6, 2019, Melissa Zeilinski provided GSK with a certification advising GSK that Rough would be able to return to work only if she did not have to work in the same department as Needles. (Doc. 24-6, at 77-78). In early July 2019, Zeilinski completed a second certification stating that Rough should remain on leave "until given a position in another area away from" Needles. (Doc. 24-6, at 91-92). Then, on August 22, 2019, Zeilinski provided GSK with a third certification stating that Rough would not be able to return to work until she was "able to work *without contact*" with Needles. (Doc. 24-6, at 103) (emphasis added).

   The Court agrees with GSK that the many certifications submitted by

21

Rough's health care providers can fairly and accurately be characterized as evidencing ever increasing restrictive accommodation requests, culminating in August 2019 with an express recommended accommodation of no contact or interaction with Needles. These certifications are consistent with, and further supported by, Rough's deposition testimony that her accommodation request was to have no interaction with Needles. (Doc. 30-2, at 212:16-20).

The next question, then, is whether Rough has met her burden of showing that her requested accommodation of no contact or interaction with Needles is "reasonable on its face, i.e., ordinarily or in the run of cases." *Barnett*, 535 U.S. at 401. Drawing from analogous caselaw, the Court finds that Rough has not met this initial burden. See *Barnett*, 535 U.S. at 403 (looking to analogous caselaw to support its conclusion that a proposed accommodation will not be reasonable in the run of cases); *Hamilton*, 414 F.Supp.3d at 1295 (same).

In *Gaul v. Lucent Technologies Inc.*, 134 F.3d 576, 579 (3rd Cir. 1998), the Third Circuit held that the plaintiff employee's accommodation "request to be transferred away from individuals causing him prolonged and inordinate stress was unreasonable as a matter of law under the ADA." The Court reasoned that "by asking to be transferred away from individuals who cause him prolonged and inordinate stress, [the plaintiff] is essentially asking this court to establish the

22

conditions of his employment, most notably, with whom he will work. However, nothing in the ADA allows this shift in responsibility." Several other courts have followed suit and similarly held that an accommodation request for reassignment away from, or for no contact with, an individual co-worker or supervisor is unreasonable as a matter of law. See e.g., *Butrym v. Burnt Hills-Ballston Lake Central School District*, 2022 WL 1102413, at *8 (N.D.N.Y. April 13, 2022) (citing *Gaul* and holding that "to the extent [the plaintiff's] ADA claim might be construed as a request for an accommodation that involved no contact with [] a single co-worker, that request was unreasonable as a matter of law"); *Wang v. HP, Inc.*, 2020 WL 674352, at *6 (D. Conn. Feb. 11, 2020) (citing *Gaul* and finding that plaintiff's request to "have no day to day contact with former fellow employees and/or supervisors" was unreasonable as a matter of law); *Hamilton*, 414 F.Supp.3d at (citing *Gaul* and concluding that the plaintiff's accommodation request for reassignment to a different supervisor was not reasonable on its face); *Langley v. DaimlerChrysler Corp.*, 407 F.Supp.2d 897, 910 (N.D. Ohio 2005) (concluding that "[a] transfer requested so that the plaintiff will not be required to work with certain people is not a reasonable accommodation" as "courts are not meant to act as a super-bureau of Human Resources") (citation and quotation marks omitted); *Newby v. Whitman*, 340 F.Supp.2d 637, 657 (M.D.N.C. 2004)

(citing *Gaul* and concluding that "an employer is not required to provide an aggravation-free or stress-free environment, or to reassign and employee away from any supervisor or coworker who may cause stress or conflict).

The one case that Rough relies on to support her argument that it was reasonable for her to request that GSK accommodate her disability by ensuring she have no contact with Needles is materially distinguishable. Rough cites *Vitchayanonda v. Shulkin*, 2019 WL 4282905, at * (C.D. Cal. Mar. 29, 2019), for the proposition that reassignment of a disabled employee to a vacant position away from a stressful situation or coworker is a reasonable accommodation. (Doc. 29, at 24). The plaintiff in *Vitchayanonda* requested accommodation in the form of a reduced work schedule or transfer to a different unit because the extensive workload in her job was exacerbating her stress and causing physical deterioration. *Vitchayanonda*, 2019 WL 4282905, at **1-2. Although the defendant argued that the plaintiff had requested a transfer because she wanted to get away from her supervisor, the court found that was only because the supervisor refused to honor the accommodation for a reduced work schedule plaintiff was initially provided. *Vitchayanonda*, 2019 WL 4282905, at *8. The court concluded that transfer to a different unit was a reasonable accommodation for the plaintiff's disability. *Vitchayanonda*, 2019 WL 4282905, at *8. Unlike here, however, the plaintiff

requested an accommodation of a transfer to another department because of her heavy workload, not because she was seeking to avoid contact with an individual co-worker.

While this Court does not go so far as to adopt a per se rule that an accommodation request for no contact or interaction with a co-worker is necessarily unreasonable as a matter of law, the Court does find based on the analogous body of caselaw described above that Rough has not shown that her requested accommodation "reasonable on its face, i.e., ordinarily or in the run of cases." *Barnett*, 535 U.S. at 401.

The Court further finds that Rough has not shown that special circumstances render her accommodation requestion reasonable under the particular factual circumstances present here. A plaintiff may make such a showing by demonstrating that her requested "accommodation would be reasonable because it 'will not likely make a difference'" to the defendant's operations. *Hamilton*, 414 F.Supp.3d at 195 (quoting *Barnett*, 535 U.S. at 405). Rough provides no reason why her request that GSK accommodate her disability by ensuring she have no contact with Needles would be reasonable because it "will likely not make a difference" to GSK's operations.

To the contrary, GSK has provided uncontroverted evidence that reassigning

her to a position having no contact or interaction with Needles would have resulted in significant disruption to its operations. GSK Site Manager Stephen Brandt explains in his supporting declaration that interaction among Site employees is possible regardless of what department they work in, and the ability to work and communicate with other departments is an essential function of every position at the Site. (Doc. 24-1, at ¶¶ 10, 12). According to Brandt, the only way to ensure that two employees have no contact with one another would be for the Site to return to running two separate shifts like it did at the old facility, or for GSK to "build an entirely separate facility with no shared spaces or overlap in production." (Doc. 24-1, at ¶ 11). Perhaps obviously, both of these options would "carry significant expense and disruption." (Doc. 24-1, at ¶ 11).

In response, Rough falls back on her argument that GSK has mischaracterized her requested accommodation and claims she was only asking GSK to minimize her contact with Needles. Rough maintains GSK could have easily accommodated such a request by reassigning her to a vacant position in a different department. As discussed above, however, the undisputed evidence demonstrates that Rough expressly requested in August 2019 that GSK accommodate her by ensuring that she have no contact with Needles.

Rough also points to evidence that she maintains shows she met the

minimum qualifications for several vacant positions at the Site and other GSK locations. (See e.g. Doc. 31, at 40 ¶¶ 95-96, 41 ¶¶ 98-99). But even assuming Rough has raised a factual dispute as to whether she met the minimum qualifications for other vacant positions at GSK, because her requested accommodation was not reasonable, either on its face or under the circumstances, GSK was not required to accommodate her by transferring her to those positions.

The Court concludes Rough has not presented any evidence of special circumstances showing why her accommodation request for no contact with a particular coworker "can constitute a 'reasonable accommodation' even though in the ordinary case it cannot." *Barnett*, 535 U.S. at 406.

In sum, and for the reasons set forth above, the Court finds that Rough has not shown that her requested accommodation is reasonable on its face or that special circumstances make her requested accommodation reasonable in this particular case. The Court therefore concludes that Rough has not met her initial burden of showing she is able to perform the essential functions of the job with reasonable accommodation, as required to establish a prima facie case of failure to accommodate under the ADA.[5] Accordingly, GSK is entitled to summary

---

[5] Having so concluded, the Court need not address GSK's alternative argument that Rough's failure to accommodate claims fails as a matter of law because the undisputed evidence demonstrates that Rough refused to participate in the

judgment on Rough's failure to accommodate claim as set forth in Count I of the Complaint.

### B.     Discriminatory Termination

As with her failure to accommodate claim, to prevail on her discriminatory termination claim under the ADA Rough must establish that she was a "qualified individual capable of performing the essential functions of the job either with or without reasonable accommodation." See *Hamilton*, 414 F.Supp.3d at 1296-97. GSK was not required to excuse Rough from performing the essential functions of her job, which included communicating and interacting with other GSK employees. See *Dark v. Curry County*, 451 F.3d 1078, 1089 (9th Cir. 2006) ("The ADA does not require an employer to exempt an employee from performing essential functions or to reallocate essential functions to other employees.).

As discussed at length above, Rough has not shown that she was capable of performing the essential functions of her former position with or without reasonable accommodation. Because there was no failure to accommodate by GSK, "there was no discriminatory termination." *Hamilton*, 414 F.Supp.3d at 1297. Accordingly, GSK is entitled to summary judgment on Rough's

---

interactive process required by the ADA.

discriminatory termination claim as set forth in Count II of the Complaint.[6]

## IV.   Conclusion

For the reasons set forth above,

IT IS ORDERED that GSK's motion for summary judgment (Doc. 21) is GRANTED, all other pending motions are denied as moot, and this case is dismissed.

DATED this 27th day of July, 2022.

_____
Kathleen L. DeSoto
United States Magistrate Judge

---

[6] Because GSK has demonstrated that it is entitled to summary judgment on both of Rough's ADA claims, the Court need not address GSK's remaining argument that Rough's claim for economic damages also fails as a matter of law.